**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

JOSHUA DAVIS,

      Plaintiff,

          v.                        CASE NO. 1:24-CV-199-HAB

AMERICAN SENIOR COMMUNITIES,
LLC,

      Defendant.

## OPINION AND ORDER

Plaintiff Joshua Davis ("Davis") originally filed this suit against Defendant American Senior Communities, LLC ("ASC") in the Allen County Superior Court on April 25, 2024, asserting claims for hostile work environment, race discrimination, and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). (ECF No. 6). ASC removed the case to this Court on May 16, 2024. (ECF No. 1). ASC disputes Davis's claims and has moved for summary judgment (ECF No. 17). That motion is now fully briefed (ECF Nos. 26, 34).

## I.     FACTUAL BACKGROUND[1]

Davis, an African-American man, worked as a bus driver at ASC's Heritage Park facility ("Heritage Park" or "the Facility") from January 15, 2023, until April 21, 2023, when his employment was terminated. (ECF No. 18 ¶¶ 1, 11, 131). As a bus driver, he was responsible for safely transporting residents to and from their medical appointments and various individual and

---

[1] The facts included in this section come from ASC's statement of material facts, affidavits and declarations provided by the parties, and Davis's deposition. Where Davis does not dispute a fact included in ASC's statement of material facts, the Court cites only ASC's statement of material facts. The Court has noted where the parties disagree.

group scheduled activities and functions. (*Id.* ¶ 12). ASC expects its bus drivers to drive safely (including obeying speed limits and always using turn signals), to review resident schedules for their appointments outside the facility, and to safely drive residents to their appointments on time. (*Id.* ¶ 14). Davis completed job-specific training for his position. (*Id.* ¶ 13).

## A.    Davis's No-Call-No-Show and Subsequent Disciplinary Process

On March 6, 2023, Davis was scheduled to report to work, but did not show up. (ECF No. 18 ¶¶ 19-20). He contacted his Supervisor, Kimball Tetzloff ("Tetzloff"), and told Tetzloff he was having car trouble. (*Id.* ¶ 20). The next day, Davis once again failed to report to work. (*Id.* ¶ 21). According to Tetzloff, Davis did not contact Tetzloff to let him know that he would not be in on March 7. (*Id.*; Tetzloff Decl. ¶ 5). Tetzloff reported this absence—which he labeled a "no-call-no-show"—to Jane King ("King"), who was handling Human Resources responsibilities for the Facility at that time. (ECF No. 18 ¶ 22). King texted Davis at 9:42 a.m., asking if he was okay, to which Davis responded: "Hey yes I am and I do apologize about the inconvenience but had a bit of car trouble in the process of getting things fixed[.]" (*Id.* ¶ 23; King Dec. Ex. 1). King then offered to drive Davis to work, but Davis did not respond until King sent a follow-up text that afternoon, to which Davis replied: "I'm sorry I'll be in tomorrow morning." [2] (*Id.*)

Also on March 7, King reported the no-call-no-show incident to Kim Hughes ("Hughes"), the Heritage Park Executive Director.  (ECF No. 18 ¶¶ 3, 25). ASC's attendance policy states that a no-call-no-show event within the first 90 days of employment calls for termination. (*Id.* ¶ 26). Davis was aware of this policy. (*Id.* ¶ 31). However, Hughes decided that Davis should be issued

---

[2] In his response to ASC's Statement of Material Facts, Davis "partially admits" the no-call-no-show, stating that he "did call in and explain[] that [he] was having car trouble and [] reported [he] would be unable to come in." ECF No. 28 at 7-8. However, the text messages quoted above, attached to King's Declaration as Exhibit 1, were identified and authenticated by Davis during his deposition. *See* Davis Dep. at 96:10-25, 97:1-24.

a final written warning instead, addressing the no-call-no-show as well as other issues with Davis's job performance. (*Id.* ¶ 25)

At Hughes's direction, King prepared the write-up. (*Id.* ¶¶ 29-30). On March 10, she called Davis and asked him to meet with her so that she could give him the write-up. (*Id.* ¶ 32). During that phone call, Davis told King that he wanted to talk to her about a separate issue: Jake Beltz ("Beltz"), a co-worker, had used the n-word in conversation with him. (*Id.* ¶ 34). King asked Davis if he was telling her that because he knew he was going to be written up. (*Id.* ¶ 35). King says she then immediately apologized for that comment (King Decl. ¶ 7.)[3] When King asked him to explain what had happened, Davis told King that Beltz had used the n-word in reference to another employee. (ECF No. 18 ¶¶ 36-37). Davis said he had tried to address the issue with Beltz directly and that he had also mentioned it to Tetzloff the week before.[4] (*Id.* ¶ 37). King assured Davis that ASC would investigate and address the matter. (*Id.* ¶ 38). She then informed Hughes and the Company began an investigation. (*Id.* ¶¶ 38, 48).

As the Company investigated the Beltz incident, Davis's disciplinary process for his no-call-no-show continued. King and Davis met to review the write-up King had prepared on March 15. (*Id.* ¶ 70). The write-up, attached to King's declaration and titled "Employee Communication Form" noted that it was being issued for a no-call-no-show event on March 7, 2023. King Decl. Ex. 2. In the section for additional details, King wrote:

> Time management is also an issue. When dropping a resident off at an appointment, leave your number with the escort or the doctor's office and then make yourself available to pick up/drop off other people. Please be on time to appointments. Always call Kimball if you are running late or calling off for the day. Two

---

[3] Davis says he does not remember King apologizing, Davis Aff. ¶ 14.

[4] Davis testified that he mentioned the incident to Tetzloff on March 3. Davis Dep. at 20-21. King says that, during the March 10 phone call, Davis said he had told Tetzloff the "week before." King Decl. ¶ 7. Tetzloff's declaration places the call on March 10 or 11. Tetzloff Decl. ¶ 6.

complaints of reckless driving. You have been witnessed being on your phone while driving. Please do not have your phone out while driving.

*Id.*

These "additional details" are explained further in the affidavits and declarations. Tetzloff states that Davis "had some issues with his time management, in terms of getting residents to their appointments on time"—something he claims he spoke to Davis about. (Tetzloff Decl. ¶ 4). Hughes states in her declaration that the Facility had "received two complaints from residents about Davis driving recklessly and them feeling uncomfortable when Davis is driving them." (Hughes Decl. ¶ 8). Hughes also states that she personally witnessed Davis driving the Facility's van while holding his phone up to his ear. (*Id.*) By contrast, Davis testifies in his affidavit that he did not have time management issues and did not fail to get residents to their appointments on time. (Davis Aff. ¶ 5). Yet Davis signed the write-up and made no comments in the space in the form for employees to add comments. (ECF No. 18 ¶ 73).

###    B.    The Beltz Investigation

According to Davis, Beltz used the n-word three times. *See* Davis Dep. at 24-31. Davis testified that the first incident happened soon after he began work at the Facility, when he and Beltz were in Beltz's truck on the way to Lowes, and the second incident happened some time in February, when he and Beltz were walking to the smoke area. (*Id.* at 29). According to Davis, in the first conversation, Beltz was describing the racial makeup of the neighborhood in which he was raised. (*Id.* at 31). Davis did not recall the details of the second conversation (*id.*) but he did recall the details of the third instance, explaining that he was sitting in the break room with Beltz when Beltz referred to another one of their coworkers as "the type of [n-word] we're talking about." (*Id*. at 24:9-13). Davis testified that during none of the three conversations did Beltz direct

the word at him. (*Id.* at 29). Davis only reported the third instance to his supervisors (*id.* at 25, 31, 143)[5] and there were no further incidents (ECF No. 18 ¶ 46).

Around the same time as Davis's phone call with King, on March 10 or 11, Tetzloff told King that Davis had reported Beltz's use of the n-word to him and Aaron Welch ("Welch"), another one of Davis's supervisors. (*Id.* ¶¶ 49-50). Tetzloff reported to King that Davis had asked Tetzloff if he would talk to Beltz, to which Tetzloff responded that he would and that he would report the matter to Human Resources. (*Id.* ¶ 52). Tetzloff assured Davis that the use of the n-word was not tolerated. (*Id.* ¶ 53). Tetzloff then asked Beltz if he had used the n-word in a conversation with Davis. (*Id.* ¶ 54). Beltz admitted to having said it once in the context of a conversation "about history," but he also told Tetzloff that he did not know he had offended Davis and had not meant to offend him. (*Id.* ¶¶ 54-55). Tetzloff informed Beltz that the use of the n-word, regardless of the context, was not tolerated and that the matter was being investigated. (*Id.* ¶ 56).

As part of the Company's investigation, King asked Tetzloff and Welch to both write statements, which they did on March 13. (*Id.* ¶ 59). King also asked Davis to write a statement, but Davis claims he refused to do so because he did not feel comfortable.[6] (*Id.* ¶ 60; Davis Dep. at 105-106).

---

[5] Davis stated in his deposition that he reported only this third conversation with Beltz to his supervisors. Davis Dep. at 25, 31, 143. He affirms this in his statement of facts. *See* ECF No. 28 at 14-15. However, ASC's statement of facts includes the assertion that, around the same time as Davis's call with King, Tetzloff reported to King that Davis had told him that "Beltz had used the n-word during a conversation Davis and Beltz were having about history." ECF No. 18 ¶ 49. It is not clear to the Court which instance Davis reported to his supervisors, and whether the report he gave to Tetzloff was the same as the report he gave to King.

[6] On March 30, Justin Beard ("Beard"), an Administrator in Training at the Facility, also asked Davis for a written statement, but Davis again refused to provide one. (ECF No. 18 ¶¶ 62-63). Davis also declined to give Beard any details about the incident, saying only that Beltz had not used the term since earlier that month but expressing frustration that ASC had yet to take action. (*Id.* ¶¶ 64-65)

On March 16, Davis called ASC's compliance hotline and complained about Beltz using the n-word. (ECF No. 18 ¶ 75). On the call, Davis alleged that Beltz had been using the n-word since January 2023, but did not provide details. (*Id.* ¶ 77). He stated that he had reported the issue to his supervisor and to King, but complained that his concerns were not being taken seriously and that no action had been taken. (*Id.* ¶¶ 77-78). Hughes reviewed the compliance hotline incident report; she was in charge of investigating the complaint. (*Id.* ¶ 76). She and King continued the investigation. (*Id.* ¶ 80).

King interviewed Beltz, who admitted that he had used the n-word as part of a conversation he and Davis were having "about the history of America, the news, and 'woke' culture." (*Id.* ¶ 82). In his declaration, Beltz again admits to using the n-word during a conversation about the "history of America." (Beltz Decl. ¶ 4). He states that he "did not call [Davis] (or anyone else) the n-word." (*Id.*) Davis admits that Beltz did not direct the word at him, but objects to Beltz's assertion that Beltz did not call anyone else the n-word, testifying in his affidavit that Beltz did use the word in reference to someone else working at the Facility. (Davis Aff. ¶¶ 28-31). In speaking with staff during the course of the investigation, King heard from another employee, Tylisha Sheppard, that Davis had told her that Beltz had called her a "thieving ass [n-word]." (ECF No. 18 ¶ 96). Beltz denied this, (*id.* ¶ 97); Davis insists it happened, (Davis Aff. ¶ 37). Tetzloff, King, and Hughes had received no prior complaints about Beltz. (ECF No. 18 ¶ 94).

At the conclusion of the investigation—at Hughes's direction—Beltz was given a written warning and was told that the use of the n-word in any context is not tolerated. (*Id.* ¶¶ 99, 101). He was also instructed to complete additional online training regarding the Company's anti-harassment policy, which he did. (*Id.* ¶ 101). In her declaration, Hughes explains that, while the use of the n-word was not appropriate, she had concluded that there was no evidence that Beltz

had any racist or malicious intent or that he had used the n-word toward Davis as a racial slur. (Hughes Decl. ¶ 19). She also found Beltz to be apologetic and remorseful, and noted that he had not been disciplined prior and she was not aware of any prior complaints about him. (*Id.*)

Apparently still unsatisfied with the Company's response, Davis filed a charge of discrimination with the local commission on or about April 4, 2023, regarding the incidents with Beltz. (ECF No. 18 ¶ 113). Hughes learned about the charge on April 7. (*Id.*)

### C.    Davis's Further Disciplinary Process and Termination

About two weeks later, on or around April 18, 2023, the Facility's scheduler for transportation Sunshine Wimbley ("Wimbley") reported to King and Hughes that a truck driver had called the Facility complaining about erratic driving by one of the Facility's vans. (*Id.* ¶ 114). Wimbley stated that she had spoken with the caller, who said that a Heritage Park van was driving recklessly through construction going North on Interstate 69 near the Dupont Road exit, bouncing in and out of traffic, cutting other drivers off, and almost hitting the caller's truck. (*Id.* ¶ 115).

King called the truck driver, (*Id.* ¶ 116) who told her that the van's driver had raced up the left lane to get around cars that were merging, cut off the car behind him, almost hit the caller's truck, and then had gotten into the right lane and began jumping from lane to lane to "leap frog" around cars. (*Id.* ¶ 118). ASC asserts that the only Facility bus driver out driving on that day in that area was Davis. (*Id.* ¶ 119). In response, Davis states that he is "unaware" of whether he was the only Heritage Park bus driver in the vicinity that day. (ECF No. 28 at 38-39).

Hughes reviewed the Wimbley and King reports and then asked Beard to meet with Davis. (ECF No. 18 ¶¶ 120-122). In his conversation with Beard, Davis denied that he had driven unsafely or erratically—a denial he maintains in his affidavit—but would not provide a written statement to refute the specific factual allegations made by the caller. (*Id.* ¶ 123; Davis Aff. ¶¶ 43-44). Beard

informed Davis he was suspended pending an investigation. (ECF No. 18 ¶ 124). Hughes, Beard, and Tonya Gonzalez ("Gonzalez"), ASC's Senior HR Consultant, then called the truck driver again; he confirmed the details he had given Wimbley and King, and said he was confident that it was a Heritage Park van that he had observed. (*Id.* ¶¶ 125-127). Hughes and Beard then confirmed that Davis had been scheduled to pick up a resident near the Dupont Road exit at or near the time of the reported incident. (*Id.* ¶ 128).

After concluding the investigation into the truck driver's complaint, and consulting with Gonzalez, Hughes and Beard decided that Davis should be terminated. (*Id.* ¶¶ 130-131). On April 21, Hughes and King called Davis and informed him about his termination. (*Id.* ¶ 131).

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between

competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

### III.    DISCUSSION

Davis alleges three federal employment claims: hostile work environment, discrimination, and retaliation. ASC moves for summary judgment in its favor as to all three claims. The Court will address each in turn.

#### A.    Hostile Work Environment

To recover under Title VII for a claim of a hostile work environment, a plaintiff must establish that (1) he was subject to unwelcome harassment, (2) the harassment was based on his race, (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation, and (4) there is a basis for employer liability. *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 895-96 (7th Cir. 2016) (citation omitted). "Relevant to this inquiry are the severity of the alleged conduct, its frequency, whether it [wa]s physically threatening or humiliating (or merely offensive), and whether it unreasonably interfere[d] with the employee's work performance." *Gates v. Bd. of Educ. of the City of Chi.*, 916 F.3d 631, 636 (7th Cir. 2019) (internal quotation marks omitted).

Davis's hostile work environment claim is based on the use of the n-word by Beltz, Davis's coworker, in the workplace. ASC admits that there is at least a question of fact as to whether Davis is able to meet the first two elements of his harassment claim, but argues that he cannot meet the third or fourth. The Court agrees.

9

To fulfill the third element of a hostile work environment claim, Davis must establish that the harassment was "sufficiently severe or pervasive to alter the conditions of employment." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 714 (7th Cir. 2017) (citation omitted). To be severe or pervasive enough to create a hostile work environment, conduct must be "extreme'" from both a subjective and objective point of view. *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018). Harassing conduct need not be both severe *and* persuasive. *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950 (7th Cir. 2005). A single instance of sufficiently severe conduct may be enough to establish a hostile work environment claim; conversely, "conduct that is not particularly severe but that is an incessant part of the workplace environment may, in the end, be pervasive enough and corrosive enough that it meets the standard for liability." *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007).

Davis is correct in stating that the use of the n-word—an "unambiguously racial epithet"— "falls on the 'more severe' end of the spectrum" of behavior that can form the basis of a hostile work environment claim. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002). The n-word is an egregious racial epithet, and can, in some circumstances, warrant Title VII liability when used only once. *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022).

However, the circumstances surrounding Beltz's use of the word mitigate its severity. To begin with, Davis admits that Beltz did not direct the n-word towards him. Where offensive statements are "directed at someone other than the plaintiff, the impact of [such] second-hand harassment is obviously not as great as the impact of harassment directed at the plaintiff." *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) (internal quotation marks omitted). Additionally, the Seventh Circuit has previously noted that a racial slur impacts the work environment far more severely when it is used by someone in a supervisory role than when it is

10

used by a mere colleague. *See Gates*, 916 F.3d at 638-39. The fact that Beltz was a colleague of Davis's, therefore, also weighs against the severity of the word. The same is true of the fact that Beltz's use of the word was accompanied by no threat of physical harm.

The Court also finds that the harassment was not sufficiently pervasive to support a hostile work environment claim. As the Seventh Circuit has explained, severity and pervasiveness "are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." *Cerros*, 288 F.3d at 1047 (internal citation omitted). Here, while there does appear to be a factual dispute as to the number of times Beltz used the n-word in front of Davis, Davis at most alleges three instances over the course of two months, with no further incidents after Davis's first report to King. These three instances do not serve to establish the kind of "relentless pattern" that constitutes "pervasive" harassment under Title VII.

Overall, while Beltz's use of the n-word was undoubtedly offensive and objectionable, the Court finds that it does not constitute harassment so "severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation." *Costco Wholesale Corp.*, 903 F.3d at 625.[7]

Davis's failure to establish that the harassment to which he was subject was severe or pervasive is dispositive to his claims' survival. But even if he had been able to satisfy this third

---

[7] The "severe or pervasive" inquiry has both a subjective and objective prong. *Robinson v. Sappington*, 351 F.3d 317, 329 (7th Cir. 2003). It is unclear whether the harassment was sufficiently subjectively severe or pervasive, as Davis submits in his affidavit that Beltz using the n-word "affected [his] work" and "affected [his] ability to go to work," Beltz Aff. ¶¶ 9, 13, 15, while in his deposition, he testifies that he did not have "any problem completing the workday" after Beltz's comment, Beltz Dep. at 34:12-25. Because the Court finds that Davis cannot show that his environment was objectively offensive, the Court need not address the subjective inquiry.

element, summary judgment in ACS's favor would nonetheless be warranted because Davis also has failed to satisfy the fourth element—a basis for employer liability.

"An employer is liable for non-supervisor harassment only if it has been negligent in discovering or remedying the harassment." *EEOC v. Vill. at Hamilton Pointe LLC*, 102 F.4th 387, 403 (7th Cir. 2024). (internal quotation marks omitted).  ASC was not negligent in discovering or remedying the alleged harassment. Once Davis reported Beltz's comments, King and Hughes began an investigation. They interviewed Beltz, took statements from Davis's supervisors, and solicited a statement from Davis himself (though Davis on multiple occassions refused to provide it). At the end of the investigation, Beltz was subject to disciplinary action. Davis testified that he had no further issues with Beltz after Davis reported the harassment. Further, Davis makes no attempt in his response brief to refute ASC's contention that he cannot show employer liability, thereby conceding the point. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *United States v. Farris*, 532 F.3d 615, 619 (7th Cir. 2008).

For these reasons, the Court grants summary judgment in favor of ASC on Davis's hostile work environment claim.

### B.  Discrimination

Title VII forbids an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[8] While Davis

---

[8] Davis also brings claims pursuant to 42 U.S.C. § 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." The analysis of a Title VII claim and a Section 1981 claim are the same, and cases discussing claims under either provision are instructive. *See Johnson v. Gen. Bd. Of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013). Thus, this Court's analysis applies with equal force under both provisions.

admits in his response brief that his discrimination claim is "more of a hostile work environment/harassment claim than it is a discrimination claim," he also offers the following summary: "Plaintiff is a Black man; he was subject to a racial slur, he reported it, and he was then shortly thereafter terminated after filing an EEOC charge. And the White employee who uttered the N-word kept his job." (ECF No. 26 at 7).

Discrimination claims may be reviewed on summary judgment under the direct or the burden-shifting methodologies. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). When a plaintiff responds to a motion for summary judgment on an intentional discrimination claim by relying on the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a court should assess the case in those terms. *Id.* However the plaintiff chooses to proceed at the summary judgment stage, the Court must consider all the evidence together to determine whether a reasonable jury could "conclude that the plaintiff's race . . . caused the discharge." *See Ortiz v. Werner Enters., Inc.*, 834 F.3d. 760, 765 (7th Cir. 2016).

Under the burden-shifting approach, which Davis appears to use (although his development of this claim is minimal, covering less than a page of his response brief), a plaintiff must come forward with evidence that (1) he is a member of a protected class, (2) he was meeting his employer's legitimate performance expectations, (3) he suffered an adverse employment action, and (4) other similarly situated employees who were not members of the protected class were treated more favorably. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If Davis establishes a prima facie case, the burden shifts to ASC to offer a permissible, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back

13

to Davis, who must then submit evidence that ASC's purported explanation is pretextual. *Id.* at 143.

Davis's status as a member of a protected class is undisputed, as is the fact that he suffered an adverse employment action. ASC argues that Davis cannot establish the other two factors and the Court agrees.

To begin with, Davis fails to present evidence of any similarly-situated, non-African-American employee who was treated more favorably. He appears to offer Beltz as a comparator, saying briefly that he was terminated shortly after filing an EEOC charge after being subject to a racial slur, while the "White employee who uttered the N-word kept his job." (ECF No. 26 at 7). Yet Davis provides no argument as to why the Court should consider Beltz similarly situated. While the requirements for finding a comparator to be similarly situated are not onerous, there must be enough of a commonality "to allow for a meaningful comparison in order to divine whether discrimination was at play." *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007). Davis's only point for comparison appears to be that both he and Beltz were employees of ASC. Davis makes no attempt to argue that he and Beltz engaged in similar conduct, so the fact that Beltz kept his job while Davis did not is meaningless to the Court's determination of whether unlawful discrimination was at play.

Further, Davis provides no evidence to demonstrate that he was meeting ASC's legitimate job needs, arguing instead that ASC has failed to establish that he has *not* met such job expectations. (ECF No. 26 at 7-8). He appears to jump straight to asserting that ASC's rationale for terminating him was pretextual, accusing ASC of "deliberately manufactur[ing]" the truck driver complaint that served as the catalytic event for his termination and denying ever driving recklessly. (*Id.*)

14

In order to demonstrate pretext, a plaintiff "must identify such weaknesses, implausibilities inconsistencies, or contradictions in [a defendant's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the defendant] did not act for the asserted non-discriminatory reasons." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). In arguing that ASC's rationale for terminating him was pretextual, Davis contends that the timing of the truck driver's complaint was "conveniently" soon after he complained of Beltz's harassment, labeling it "too fishy to [be] believed." (ECF No. 26 at 8). Davis describes the truck driver as "unknown" and characterizes the reckless driving report as a "ghost allegation." (*Id.*) He denies ever driving recklessly. (*Id.*)

But while suspicious timing may reveal discriminatory intent, *see Castro v. Devry Univ, Inc.*, 786 F.3d 559, 565 (7th Cir. 2015), "suspicious timing alone is rarely enough to survive summary judgment," particularly where "there are reasonable, non-suspicious explanations for the timing of . . . termination," *Morgan v. SVT, LLC*, 724 F.3d 990, 998 (7th Cir. 2013). Here, there is a reasonable, non-suspicious explanation—the truck driver's report of erratic driving by a Heritage Park driver and the conclusion of ASC's subsequent investigation. Also relevant are the no-call-no-show event and the history of instances of reckless driving and time management issues detailed in the write-up—a write-up Davis signed. Further, ASC successfully rebuts Davis's characterization of the report as a "ghost allegation" in its reply brief, explaining that Davis received the truck driver's witness statement and conversation notes in ASC's initial disclosures. (ECF No. 34 at 12-13). ASC has provided copies of the initial disclosures, confirming that Davis received information regarding the truck driver's report. *See* ECF No. 35-2.

Davis provides no additional information to corroborate his accusation of suspicious timing, saying only that he denies ever driving recklessly. But Davis cannot rely on suspicious

15

timing and blanket denials to support an accusation of pretext, particularly where, as here, ASC had documented a history of reckless driving before the truck driver's report. *See Igasaki v. Ill. Dep't of Fin. and Prof. Regul.*, 988 F.3d 948, 960 (7th Cir. 2021) ("[Plaintiff] must provide more than his mere assertions to defeat summary judgment, especially when his poor performance provided [Defendant] with a nondiscriminatory rationale for his termination.")

Because Davis cannot show that he was performing his job satisfactorily, or that a similarly situated employee of a different race was treated more favorably, Davis has not successfully made out his prima facie case of race discrimination. He has also failed to demonstrate that ASC's rationale for his termination was pretextual.

Thus, the Court grants summary judgment in favor of ASC on Davis's discrimination claims.

### C.    Retaliation

In order to succeed on a claim for retaliation under Title VII, a plaintiff must establish that (1) he or she engaged in protected activity, (2) he or she suffered adverse employment actions, and (3) there was a causal connection between the protected activity and the adverse employment actions. *Castro*, 786 F.3d at 564. A plaintiff may offer circumstantial evidence of intentional retaliation, "including evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Boumehdi,* 489 F.3d at 792.

There is no dispute that Davis engaged in protected activity—reporting Beltz, calling the hotline, and filing his EEOC claim—and that he suffered an adverse employment action—his termination. Where his case falls apart is the causation element.

16

In support of his argument that there exists a causal connection here, Davis once again argues for a finding that ASC's reasons for terminating him were pretextual. (ECF No. 26 at 10). He again relies on "suspicious timing"—he reported the harassment to the company hotline around March 16, then he filed an EEOC charge around April 7, and then was terminated very soon thereafter on April 21. (*Id.*) He repeats his accusation that ASC fabricated the truck driver's complaint: "Davis claims that ASC cannot honestly believe the rantings and ravings of an unknown person who's [sic] story cannot be verified." (*Id.*)

As additional support for his claim of retaliation, Davis also cites his phone call with King on March 10, when he raised Beltz's use of the n-word and she asked if he was bringing it up because he was about to be written up. (*Id.* at 8-9). Davis contends that this is proof that his initial report of the harassment "was not met with sincerity." (*Id.* at 9).

Although King's question was certainly ill-advised and inappropriate, the Court does not find that it rises to the level of evidence of retaliatory intent. To begin with, King was not one of the people who made the decision to terminate Davis. Further, King's comment notwithstanding, the evidence shows that ASC through its employees—including King—did address his complaint with sincerity. Immediately after her phone call with Davis in which he raised this issue of Beltz's harassment for the first time, King reported the complaint to Hughes, and the company began an investigation. Hughes solicited statements from Davis's supervisors, Beltz, and Davis. Beltz was ultimately disciplined.

Because Davis has failed to establish a causal connection between his engagement in protected activity and his termination, the Court grants summary judgment in favor of ASC on Davis's retaliation claim.

**D.      Evidentiary Objection**

In its reply brief, ASC offers two evidentiary objections. First, ASC argues that the affidavit filed by Davis in support of his response is a "sham affidavit." (ECF No. 34 at 3-5). Second, ASC argues that much of Davis's response to ASC's statement of material facts should be disregarded due to its reliance on conclusory, speculative, and inadmissible evidence, as well as non-responsiveness. (*Id.* at 5-7).

Because the Court finds that summary judgment in favor of ASC is merited even considering Davis's affidavit and responses to ASC's statement of material facts, it need not address the evidentiary objections on their merits.

**E.      CONCLUSION**

For the above-stated reasons, the Court **GRANTS** ASC's motion for summary judgment (ECF No. 17) in its entirety.

**SO ORDERED** March 10, 2026.

s/Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT